UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DONALD WILSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) Case No. 3:11-CV-82 JD |
| v. | ) |
| | ) |
| SUPERINTENDENT, | ) |
| | ) |
| Respondent. | ) |

OPINION AND ORDER

Donald Wilson, a *pro se* prisoner, is serving an aggregate 60-year sentence for murder and two counts of attempted murder. *State v. Wilson*, No. 10C01-9406-CF-86. He filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his convictions [ECF No 1].

I.  BACKGROUND

In deciding the petition, the Court must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). It is Wilson's burden to rebut this presumption with clear and convincing evidence. *Id*. On post-conviction review, the Indiana Court of Appeals set forth the facts underlying Wilson's convictions as follows:

> Shortly after midnight on the morning of May 27, 1994, forty-five-year-old Wilson drove to the Keg Liquor Lounge in Clarksville. His wife, Judith Bowles Wilson (Judy), from whom a divorce was pending, was employed at the Keg and working that night. Wilson was aware his wife was seeing someone. While standing outside the Keg, Wilson engaged in a brief conversation with Charles Wise, an employee at the liquor store next to the Keg. Wise recalled Wilson saying "looks like lover is here tonight." Wise testified that he knew Wilson was referring to Antonio Rodriguez, Judy's boyfriend, and that Rodriguez was inside the bar.
>
> Following that conversation, Wilson walked into the Keg carrying a Ruger .357 Magnum handgun. Wilson observed his estranged wife speaking to Rodriguez, and twice demanded to see her outside. After seeing Rodriguez make some sudden movements, Wilson shot at Rodriguez at least once, striking him in the left forearm. As Rodriguez fell to the ground and crawled behind the bar, Judy, who was already

behind the bar, ran towards the kitchen. Wilson then turned and fired two shots in Judy's direction.

Another patron who was in the bar at the time, Jack Bierly, later told police he believed Wilson actually fired two shots at Rodriguez. Bierly also observed Wilson raise and aim his gun in the direction of Judy. At that point, Bierly got up and ran out the front door of the bar. He heard more shots fired inside the bar as he ran. Wilson followed Bierly outside. Bierly heard Wilson yelling at him to stop running. Bierly testified that he then turned and saw Wilson pointing the .357 Magnum at him. Bierly drew his own revolver and shot at Wilson five times. Wilson fired twice in the direction of Bierly, though Wilson contends that the discharges were accidental. Bierly was not hit by these shots. Wilson sustained multiple gunshot wounds from Bierly's shots before he fled to the car he had driven, parked in an adjacent lot.

Police found Wilson collapsed next to a car in a lot adjoining the Keg. He had been shot in the stomach, chest, and right pinky finger. Inside the lounge, they found Judy Bowles Wilson dead from a gunshot wound to the head. A bullet had entered her left temple and exited the back of her skull. Police also found the injured Rodriguez.

The police searched the car next to which Wilson had been found. The car belonged to an employee of the company where Wilson was a manager. Inside the car, they found one of Wilson's business cards. They also found a box of .357 caliber ammunition, a shotgun, and a box of shotgun shells. None of these items belonged to the owner of the car, nor had he given permission for Wilson to borrow the car or put the guns and ammunition in it.

Wilson was transported from the scene to the hospital and remained there for surgery and follow-up care. On June 3, police arrested Wilson and charged him with the murder of Judy Bowles Wilson, the attempted murder of Rodriguez and Bierly, and carrying a handgun without a license.

In August 1995, Wilson filed a notice of insanity defense. The court appointed two independent psychiatrists to examine Wilson. They both concluded he was not insane. Defense counsel contacted the Veteran's Hospital and the Veteran's Administration in search of an expert on post-traumatic stress disorder. Counsel was consistently recommended to use David Moore, a social worker who had treated hundreds of veterans for post-traumatic stress disorder over the previous four years. At the time of the trial, Moore was in private practice. Before that, he was associated with the V.A. Medical Center in Louisville. Moore was a licensed clinical social worker with two Master's Degrees, one in Social Work from the University of Louisville and one in Divinity from Southern Baptist Theological Seminary in Louisville. Moore had also competed 300 hours of continuing education, had six certifications, and was published. In addition, he had a Ph.D. in Social Work from

the External Degree Program at Pacific Western University in Hawaii, and had experience testifying as an expert at trial.

During preliminary questioning of Moore regarding his qualifications as an expert, defense counsel asked Moore if he got his Ph.D. from a "correspondence school." Moore acknowledged he was not in Hawaii when he got his degree and that Pacific Western University was a correspondence school. Following the preliminary questioning, the trial court qualified Moore as "an expert clinical social worker for . . . [the] evaluation and treatment for Post–Traumatic Stress Disorder."

Moore testified that he evaluated Wilson and reviewed past medical and administrative documents. Moore explained to the jury how Wilson's family and military history related to his symptoms to show how and why Wilson suffered from post-traumatic stress disorder. He testified that Wilson suffered from severe post-traumatic stress disorder and that he was insane at the time he murdered his estranged wife and shot Bierly and Rodriguez.

Also at trial, the two court-appointed experts testified Wilson was not insane. Donald O'Brien, Judy's brother, testified Wilson told him if he ever caught Judy with Rodriguez, he (Wilson) would kill them. Samuel Dryden, Wilson's former employee, testified Wilson told him if he ever killed anyone, he would use "Vietnam flashback syndrome" as a defense. An August 1995 jury trial ended in a mistrial. In December 1995, Wilson was convicted of all charges in a second jury trial.

Following a sentencing hearing, the trial court found the following aggravating factors: 1) the impact on the victim's family; 2) the minimum sentence would depreciate the seriousness of the crime; 3) Wilson's need for correctional rehabilitation; 4) Wilson wounded Rodriguez and shot at Bierly; 5) the murder was premeditated; and 6) Wilson lacked remorse. The trial court found no mitigating factors and sentenced Wilson to sixty years for murder, forty years for each count of attempted murder, and one year for carrying a handgun without a license, all sentences to run concurrently.

*Wilson v. State*, No. 10A04-1001-PC-12, slip op at *1-2 (Ind. App. Ct. June 24, 2010) (internal citations omitted).

Wilson appealed, raising a double jeopardy claim and a number of errors in connection with the jury instructions. *Id.* The Indiana Supreme Court affirmed. *State v. Wilson*, 697 N.E.2d 466 (Ind. 1998). Wilson did not seek review in the United States Supreme Court [ECF No. 1 at 2].

3

In November 1999, Wilson filed a petition for post-conviction relief, which he later withdrew, refiled, and then amended. *Wilson*, No. 10A04-1001-PC-12, slip op at *5. Following an evidentiary hearing at which Wilson's trial and appellate attorneys testified (and at which Wilson was represented by counsel), the court denied the petition. *Id.* The Indiana Court of Appeals affirmed, and the Indiana Supreme Court denied Wilson's petition to transfer [ECF No. 12-4].

Thereafter, Wilson filed this federal habeas petition raising the following claims: (1) his trial attorneys were ineffective in failing to call a "more qualified" expert witness to testify in support of his insanity defense; (2) his trial attorneys were ineffective in failing to object to certain comments by the prosecutor during closing argument; and (3) his appellate counsel was ineffective in failing to challenge the length of his sentence on direct appeal. [ECF No. 1 at 5-6.]

## II. ANALYSIS

Wilson's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court can grant an application for habeas relief if it meets the stringent requirements of 28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under this deferential standard, a federal habeas court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court decision is "contrary to" federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court or reaches an opposite result in a case involving facts materially indistinguishable from relevant Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively" unreasonable. *Id.* In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, —U.S.—, 131 S. Ct. 770, 786 (2011). Furthermore, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

Here, all of Wilson's claims are premised on alleged ineffective assistance of trial and appellate counsel[1] [ECF No. 1]. Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel——that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Van Hook*, —U.S.—, 130 S. Ct. 13, 16 (2009). To prevail on a claim of ineffective assistance, the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him.

---

[1] Wilson had a team of three privately retained attorneys who represented him at trial. [*See* Post-Conviction Review ("PCR") Tr. at 10, 13-14, 22.] One of those attorneys, Vicki Carmichael, was also retained to handle his appeal. [*Id.* at 31.]

*Strickland v. Washington*, 466 U.S. 668 (1984). On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices . . . ." *Harrington*, 131 S. Ct. at 788. The Court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a habeas proceeding; the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004). The Court presumes that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, and will "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight." *Ebert v. Gaetz*, 610 F.3d 404, 412 (7th Cir. 2010). Furthermore, the Court must not evaluate counsel's performance with the benefit of hindsight. Instead, "habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, —U.S.—, 131 S. Ct. 733, 741 (2011).

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id*. at 693. In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Harrington*, 131 S. Ct. at 791. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 792. Where it is expedient to do so, the Court may resolve an ineffective

6

assistance claim solely on the prejudice prong, because if the petitioner cannot establish prejudice, there is no need to "grade" counsel's performance. *Strickland*, 466 U.S. at 697.

A claim of ineffective assistance of appellate counsel is also subject to the *Strickland* analysis. *Howard v. Gramley*, 225 F.3d 784, 789-90 (7th Cir. 2000). On the deficiency prong, the petitioner must show that counsel failed to present a "significant and obvious" issue on appeal. *Id.* at 790. However, counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). On the prejudice prong, the petitioner must demonstrate that if the argument had been raised, there is "a reasonable probability that his case would have been remanded for a new trial or that the decision of the state trial court would have been otherwise modified on appeal." *Howard*, 225 F.3d at 790. Where the underlying argument has no merit, an ineffective assistance claim cannot succeed, because "[f]ailure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996).

Wilson's first claim is that his trial attorneys were ineffective in failing to call a "more qualified" expert to testify in support of his insanity defense. [ECF No. 1 at 5.] He complains that Dr. Moore was "not a Psychiatrist or Psychologist" and that his Ph.D. "came from a correspondence school." [*Id.*] In rejecting this claim, the Indiana Court of Appeals properly identified *Strickland* as the governing standard. *See Wilson*, No. 10A04-1001-PC-12, slip op. at 6. The court determined that Wilson failed to establish that his trial team provided ineffective assistance in connection with Dr. Moore's testimony. *Id.* at 9-10. Based on the record, this was not an unreasonable application of *Strickland*.

7

The record reflects that at the time he was certified by the trial court as an expert in Wilson's case, Dr. Moore was in full time private practice; prior to that he was associated with the Veterans Administration Medical Center in Louisville, Kentucky, where he evaluated and treated "several hundred" veterans with post-traumatic stress disorder ("PTSD"). [Trial Tr. at 1630-34, 1728.] Although Dr. Moore earned his Ph.D. through an external degree program, he had two Master's degrees and was a licensed clinical social worker. *See Wilson*, No. 10A04-1001-PC-12, slip op. at 10. Dr. Moore had also completed 300 hours of continuing education, had six certifications, was a published author, and had been certified as an expert in prior cases. *Id.* Additionally, Dr. Moore was recommended to the defense by both the Veterans Administration and the Veterans' Hospital.[2] [PCR Tr. at 10-11, 15, 16, 33.]

The record also shows that Dr. Moore provided a significant amount of testimony that was favorable to the defense. Dr. Moore diagnosed Wilson with "severe" PTSD, and in a cogent narrative, he described Wilson's family, military, and medical history and linked that history with the signs indicating that Wilson was suffering from PTSD. [Trial Tr. at 1635-89, 1728.] Dr. Moore concluded that Wilson was insane at the time of the shooting due to his mental illness. [*Id.* at 1689.] Although the jury ultimately disbelieved Wilson's insanity defense, this cannot be attributed to any failing by counsel. As stated above, two court-appointed experts testified that Wilson was sane at the time of the shooting, and a former co-worker testified that Wilson had once told him if he ever killed anyone he would claim "Vietnam flashback syndrome" as a defense. *Wilson,* No. 10A04-1001-PC-12, slip op. at 10.

---

[2] Wilson's defense team had also retained clinical psychologist Dr. William Freeman to testify on Wilson's behalf, but during the trial Dr. Freeman became unavailable due to a medical emergency. [PCR Tr. at 10, 16-17.] Dr. Freeman later recovered and testified at Wilson's sentencing hearing. [*See* Trial Tr. at 1922-34.]

In support of his argument that counsel provided ineffective assistance in connection with Dr. Moore's testimony, Wilson points to *Stevens v. McBride*, 489 F.3d 883 (7th Cir. 2007). However, as the appellate court concluded, that case is distinguishable from Wilson's case. In *Stevens,* the defendants' lawyers believed their expert, a psychologist, to be a "quack,"[3] but they did not try to obtain an alternative expert. *Id.* at 888. Even though called by the defense, the doctor provided a considerable amount of testimony that was damaging to the defense, including volunteering that the defendant had sociopathic traits, that he had been sexually aroused by killing the victim, and that he had masturbated on the victim's body. *Id.* at 890. After the defendant was convicted of murder, the defense team called the doctor a second time at sentencing, during which he described the defendant as presenting a "great risk to society." *Id.* The defendant was thereafter sentenced to death. *Id.*

Here, unlike in *Stevens*, there is nothing to indicate that Wilson's defense team believed Dr. Moore to be a "quack," nor is there any evidence to suggest that he was in fact a "quack." As indicated above, Dr. Moore had a significant amount of education and direct experience treating veterans with PTSD, and was recommended by two government agencies serving veterans. Also unlike the expert in *Stevens*, Dr. Moore provided testimony that was favorable to the defense. Based on the record, Wilson has failed to show that the Indiana Court of Appeals' rejection of this claim was unreasonable and, accordingly, the claim is denied.

---

[3] Among other peculiarities, the doctor subscribed to an unusual psychological theory called the "myth of mental illness," whose adherents do not believe that mental diseases exist. *Stevens*, 489 F.3d at 888. The defense team also learned prior to trial that one of the doctor's favorite therapeutic techniques was something called "trust and bonding" therapy, which the doctor described as "putting 18-year olds on his lap and sticking a bottle in their mouth." *Id.*

Wilson's next claim is that trial counsel was ineffective in failing to object to comments by the prosecutor during closing arguments. [ECF No. 1 at 5.] Specifically, he complains that in various points during closing arguments, the prosecutor referred to the defense team as the "Dreaming Team,"[4] and to his defense as a "smoke screen." [*Id.*] The state appellate court determined that Wilson failed to establish deficient performance or prejudice in connection with this claim. *Id.* at 10-11. Based on the record, this was not an unreasonable application of *Strickland*.

During closing arguments, the prosecutor stated in part:

> Well I look at these people and I don't see the Dream Team, I see the Dreaming Team with a pipe dreamer for a client. It just doesn't float. Some of you will know what a smoke screen is and what it's used for and in defense it's used to hide what is really there, to let them move around issues and skirt things. Think about in your notes the various smoke screens that were raised. One obviously is self-defense. One is insanity. . . . Think about it. They didn't attack him. . . . Wilson is sane.

[Trial Tr. at 1860-61.] He further stated:

> I hope that you have the courage to come back and look him straight in the eye when you finish your deliberation and let him know that his little story, his little smoke screens did not impress you . . . Smoke screen, self defense? You're going to let that guy go for shooting Tony Rodriguez because it may have been self-defense, Tony moved? Do you realize from the evidence that if Tony had not put his hand up there by his head he would be dead? . . . . Today is the first time in this case that finally a jury is going to go back and show that man what he deserves and what his accounts and his Dreaming Team could come up with. It doesn't wash. Look at the evidence.

[Trial Tr. at 1869, 1873.] Wilson argues that his defense team was ineffective in failing to object to these comments.

When an ineffective assistance claim is premised on the failure to raise an objection at trial, the claim hinges on state law; if the objection would not have been sustained, counsel cannot be considered ineffective for failing to object. *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001);

---

[4] The prosecutor's comments were apparently inspired by the O.J. Simpson trial, in which the defense lawyers had been referred to as the "Dream Team." [PCR Tr. at 26.]

*Stone*, 86 F.3d at 717. In this case, there was overwhelming evidence against Wilson, including the testimony of eyewitnesses that he entered the bar with a gun and shot two unarmed people, then chased after and shot at a third person before getting shot himself. In response to this evidence Wilson offered an insanity defense, which the prosecution rebutted with evidence that Wilson had previously told someone he would raise a false "Vietnam flashback syndrome" defense if he ever killed anyone. Wilson also raised a self-defense theory with respect to the attempted murder of Rodriguez and claimed that the shooting of Bierly was accidental, despite the contradictory evidence. Under these circumstances, it is unlikely that an objection to the prosecutor's comments would have been sustained under Indiana law. *See Sobolewski v. State*, 889 N.E.2d 849, 858-59 (Ind. Ct. App. 2008) (prosecutor's comment that defense attorney was "incompetent and underhanded" did not constitute misconduct, since "[b]reaches of civility and attacks on the integrity or competence of counsel . . . are ordinarily matters for another forum"); *Donnegan v. State*, 809 N.E.2d 966, 973 (Ind. Ct. App. 2004) (prosecutor's comment that the entire defense constituted "smoke and mirrors designed to get you to take your eye off the ball and focus on something stupid" was permissible comment on the quality of the defense); *see also Hamlett v. State*, 859 N.E.2d 395 (Table), 2006 WL 38232814 (Ind. Ct. App. Dec. 29, 2006) (prosecutor's comment to jury that defense was "[t]rying to get you buried in a smoke screen so you don't see the fire" was a permissible comment on the evidence, where several eyewitnesses inculpated the defendant); *Greenlee v. State*, 856 N.E.2d 795 (Table), 2006 WL 3196554 (Ind. Ct. App. Nov. 6, 2006) (prosecutor's comment that defense was trying to "throw up a smoke screen and blame everybody else" was not improper where defense strategy was to blame another man involved in the robbery and blame the police for failing to conduct a thorough investigation).

Even assuming Wilson could establish that the comments were objectionable, the Indiana Court of Appeals determined that he was not unduly prejudiced by them. *Wilson*, No. 10A04-1001-PC-12, slip op. at 10-12. In assessing prejudice, the Court should consider a number of factors, including whether the prosecutor misstated the evidence, whether the remarks implicated specific rights of the accused, the defendant's opportunity to rebut, and the weight of the evidence against the defendant. *See Ellison v. Acevedo*, 593 F.3d 625, 636 (7th Cir. 2010). The comments at issue here did not misstate the evidence or implicate Wilson's constitutional rights. Instead, they were in the vein of an attack on the plausibility of the defense theories. Wilson's attorney had an opportunity to rebut these comments during the defense argument, and the comments constituted a small portion of an argument that focused extensively on the evidence. [*See* Trial Tr. at 1854-75, 1898-1907.] Furthermore, as outlined above, the evidence of Wilson's guilt was overwhelming. Based on the record, Wilson has failed to establish that the state court's rejection of this claim was unreasonable and, therefore, the claim is denied.

Wilson's final claim is that appellate counsel provided ineffective assistance in failing to challenge his sentence on direct appeal. [ECF No. 1 at 6.] The state appellate court determined that Wilson failed to establish prejudice in connection with this claim because a challenge to his sentence would not have been successful. *Id.* at 12-17. Based on the record, this was not an unreasonable application of *Strickland*.

The record shows that at the time of Wilson's offense, the presumptive sentence for murder was 40 years, with no more than 20 years added for aggravating circumstances and no more than 10 years subtracted for mitigating circumstances. *Id.* at 12 (citing IND. CODE § 35-50-2-3). In Wilson's case, the trial court imposed a 60-year sentence for the murder conviction and 40-year

sentences for the two attempted murder convictions, all to run concurrently. *Id.* The court imposed an enhanced sentence on the murder conviction based on several aggravating circumstances: 1) the impact on the victim's family; 2) the minimum sentence would depreciate the seriousness of the crime; 3) Wilson's need for correctional rehabilitation; 4) Wilson wounded Rodriguez and shot at Bierly; 5) the murder was premeditated; and 6) Wilson lacked remorse. *Id.* at 1.

On post-conviction review, the Indiana Court of Appeals considered the propriety of Wilson's sentence in connection with this claim. *Id*. at 12-17. The court determined that the impact on the victim's family was an improper aggravator, but because the other aggravators were proper, a reversal would not have been warranted. *See Wilson*, No. 10A04-1001-PC-12, slip op. at 16-17. Under Indiana law, the presence of even one aggravator is sufficient to support an enhanced sentence, and here there were five. *See McCarthy v. State*, 749 N.E.2d 528, 539 (Ind. 2001). Under these circumstances, Wilson cannot show that counsel was deficient in failing to challenge his sentence on direct appeal or that he suffered any prejudice. *Hough*, 272 F.3d at 898-99 (when an argument would have been unavailing under state law, counsel cannot be considered ineffective in failing to raise it); *Stone*, 86 F.3d at 717 (counsel on direct appeal was not deficient in failing to raise an argument that the state supreme court considered and rejected on post-conviction review).

Furthermore, at the post-conviction hearing, Wilson's appellate counsel testified that she opted not to raise a sentencing issue on appeal; her view was that such an argument was not advisable because the trial court had discretion to run the sentences consecutively based on even one aggravator, which would have resulted in a sentence far greater than 60 years. [PCR Tr. at 28-29.] She chose instead to focus on what she deemed to be stronger arguments, which was a

13

permissible strategy.[5] *See Smith*, 528 U.S. at 288 (counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."). Specifically, she argued that double jeopardy barred Wilson's prosecution following the mistrial and various errors in connection with the jury instructions. *Wilson*, 697 N.E.2d at 470-66. If successful, these arguments would have resulted in dismissal of the charges or, at a minimum, a new trial. *See Smith v. State*, 459 N.E.2d 355 (Ind. 1984) (defendant who established error in the jury instructions was entitled to new trial); *Quiroz v. State*, 963 N.E.2d 37 (Ind. Ct. App. 2012) (where the defendant established a double jeopardy violation, court reversed and remanded with instructions to vacate his conviction). Although these arguments ultimately did not prevail, the Indiana Supreme Court found them important enough to warrant the issuance of a 12-page published opinion. *See Wilson*, 697 N.E.2d at 470-66. Given the substantial deference that is owed to counsel's strategic decisions, and the unlikelihood that a challenge to Wilson's sentence would have resulted in a lower sentence, Wilson has not demonstrated that he received ineffective assistance from appellate counsel. The state court's rejection of this claim was not unreasonable and, therefore, the claim is denied.

As a final matter, Wilson attaches a page to the back of his petition in which he makes reference to other alleged grounds of ineffective assistance of counsel, including trial counsel's failure to "provide a Ballistic expert witness," trial counsel's failure to investigate, and appellate counsel's failure to raise various arguments on direct appeal. [*See* ECF No. 1 at 10.] The petition is not a model of clarity, but to the extent Wilson is attempting to raise these as additional claims,

---

[5] At the post-conviction hearing, counsel testified that by the time she represented Wilson she had handled "several hundred" direct appeals. [PCR Tr. at 27.] By the time of the post-conviction hearing, she had become a judge in Clark County Superior Court. [*Id.* at 21.]

they would be procedurally defaulted. To properly exhaust, the petitioner must raise his claims in one complete round of state review, either on direct appeal or in a post-conviction proceeding. *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). Furthermore, each ground of ineffective assistance is considered separate for exhaustion purposes. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). Thus, "the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default." *Id.* (internal citation omitted). Here, Wilson only raised the three ineffective assistance claims addressed herein before the Indiana Court of Appeals. [ECF No. 12-5 at 8-9.] His failure to raise these additional grounds in one complete round of state review means that he has procedurally defaulted these claims. *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). Wilson does not acknowledge his procedural default, let alone provide any grounds for excusing it, and the Court therefore does not reach the merits of these claims.

Similarly, Wilson appears to raise multiple new claims in his two traverses, including an alleged *Brady* violation, a violation of his Fifth Amendment right against self-incrimination, and a judicial bias claim. [ECF Nos. 22, 29.] A traverse is not the place to raise new claims that were not contained in the petition. *See* RULE 2(C)(1) OF THE RULES GOVERNING SECTION 2254 CASES (providing that all grounds for relief must be contained in the petition). Even if Wilson could overcome this procedural problem by seeking leave to amend his petition, these new claims would be time-barred since they were raised after the one-year deadline for seeking federal habeas relief.[6]

---

[6] Wilson's conviction became final in 1999 when his direct review proceedings concluded; however, he had a state post-conviction petition pending from 1999 to 2010, which tolled the limitations period for seeking federal habeas relief. *See* 28 U.S.C. § 2244(d)(1)(A), (d)(2). The post-conviction proceedings came to a conclusion on August 4, 2010, when the Indiana Supreme Court denied Wilson's petition to transfer [ECF No. 12-4 at 5]. Wilson had one year from that date, or until August 4, 2011, to file a federal habeas petition. 28 U.S.C. § 2244(d)(1)(A). Wilson timely filed his petition in February 2011 [ECF No. 1 at 9], but the filing of the petition did not stop the clock from running. *See Tucker v. Kingston*, 538 F.3d 732, 733 (7th Cir. 2008). Wilson filed his first traverse in November 2011 and a second traverse in April 2012 [ECF Nos. 22, 29], both of which were after the one-year deadline had expired.

15

*See Mayle v. Felix*, 545 U.S. 644, 663-64 (2005) (once federal deadline has expired, petitioner cannot amend petition to add new grounds for relief based on a different constitutional claim). Furthermore, even if the claims could be deemed timely, the bulk of them were not raised in one complete round of state review and would be procedurally defaulted. *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). Again, Wilson does not acknowledge his procedural default or provide grounds for excusing it, which precludes the Court from reaching the merits of these claims.

Wilson's only proposed claim that was raised in one complete round of state review is a double jeopardy claim; however, even if the Court could reach this claim on the merits, it would not entitle Wilson to federal habeas relief. The crux of Wilson's claim is that his second trial was barred by double jeopardy because the first trial resulted in a mistrial brought about by prosecutorial misconduct. *See Wilson*, 697 N.E.2d at 470-73. In rejecting Wilson's claim on direct appeal, the Indiana Supreme Court properly identified the applicable Supreme Court precedent, which requires the defendant to establish that the prosecutor engaged in intentional misconduct designed to provoke him into moving for a mistrial. *See id.* at 472-73 (*citing Oregon v. Kennedy*, 456 U.S. 667 (1982)). Applying that standard, the Indiana Supreme Court found no indication that the prosecutor in Wilson's case was deliberately trying to create the need for a mistrial. *Id.* at 472. The record supports this conclusion. Specifically, Wilson was granted a mistrial after a police officer inappropriately testified regarding Wilson's invocation of his *Miranda* rights. *Id.* at 470-71. The record reflects that the officer was extremely nervous about testifying, and that he volunteered this information even though it was not directly responsive to the prosecutor's question, in the course of providing other proper testimony. *Id.* at 471-72. The prosecutor was nine witnesses into his case at that point and was questioning the officer about an appropriate topic. *Id.* The trial court, which

had the opportunity to observe these events firsthand, including the demeanor of the witness and the prosecutor, concluded that the prosecutor had not acted intentionally. *Id.* at 471. Under these circumstances, the state court's rejection of Wilson's double jeopardy claim was not unreasonable. *See Kennedy*, 456 U.S. at 666-68 (no double jeopardy violation where there was no indication the prosecutor intended to goad the defendant into seeking a mistrial, even though the prosecutor had engaged in "overreaching"). Thus, assuming the Court could reach this claim on the merits, it would not entitle Wilson to federal habeas relief.

Pursuant to RULE 11 of the RULES GOVERNING SECTION 2254 CASES, the Court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). For the reasons fully explained above, Wilson has not made a substantial showing of the denial of a constitutional right, nor does the Court find a basis to conclude that jurists of reason could debate the outcome of the petition or find a reason to encourage Wilson to proceed further. Accordingly, the Court declines to issue Wilson a certificate of appealability.

III. CONCLUSION

For the reasons set forth above, the Court DENIES the petition [ECF No. 1] and DENIES the petitioner a certificate of appealability.

SO ORDERED.

ENTERED:  May 14, 2012  

                                                             /s/ JON E. DEGUILIO  
                                              Judge  
                                              United States District Court